**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sylvia Norwood,<br><br>    Plaintiff,<br><br>v.<br><br>Arizona Department of Child Safety, et al.,<br><br>    Defendants. | No. CV-18-04956-PHX-DWL<br><br>**ORDER** |

   This lawsuit arises from the tragic death of S.C., a seven-year-old girl, in February 2017.  (Doc. 13 ¶ 18.)  S.C. died while living with her biological father, Germayne Cunningham, and her stepmother, Lisa Cunningham.  (*Id*. at 2 & ¶ 28.)  The plaintiff is Sylvia Norwood, S.C.'s biological mother, who is suing in her individual capacity and as the personal representative of S.C.'s estate.  (*Id*. ¶¶ 1-3.)  Norwood alleges that various public entities and state actors—Goodyear Police Officer Regan McCarthy, the City of Goodyear (the "City"), the Arizona Department of Child Safety ("DCS"), and DCS Director Gregory McKay (collectively, "Defendants")—knew the Cunninghams were abusing S.C. in the months preceding her death but failed to intervene.  (*Id*. ¶¶ 45, 55, 58.)  Norwood further alleges that Defendants' inaction was due in part to their deference to Mr. Cunningham's status as a member of the Phoenix Police Department.  (*Id*. ¶ 28.)

   Now pending before the Court are motions to dismiss by Officer McCarthy and the City (collectively, the "City Defendants") (Doc. 26) and Director McKay and DCS (collectively, the "State Defendants) (Doc. 27).  For the following reasons, both motions will be granted and this action will be terminated.

# BACKGROUND

I. <u>Factual Background</u>

The facts alleged in Norwood's first amended complaint ("FAC") are as follows.

In March 2016, an unidentified DCS employee was "called out" to the Cunninghams' residence in Goodyear and "ruled there were no signs of neglect." (Doc. 13 ¶ 20.)

In October 2016, an unidentified DCS employee was again "called out" to the Cunninghams' residence and "again ruled there were no signs of neglect." (*Id.*)

On December 21, 2016, Officer McCarthy and other unspecified Goodyear police officers visited the Cunninghams' residence, in response to a request by Norwood, to investigate allegations that S.C. was being neglected and abused. (*Id.* ¶ 12.) Upon arriving, Officer McCarthy found S.C. seated in a lawn chair in the Cunninghams' laundry room. (*Id.* ¶¶ 12, 13, 23.) S.C. wore a large sweatshirt with the arms tied around the back of the chair, which restrained her and restricted her movement. (*Id.*) Mr. Cunningham, a detective in the Phoenix Police Department, explained to Officer McCarthy that S.C. was schizophrenic and engaging in self-harm and "this [method of restraint] was the only way they knew to prevent it." (*Id.* ¶¶ 13, 28.) Although Mr. Cunningham "denied any abuse," Officer McCarthy noted a lock on the exterior door of the laundry room and various cuts, bruises, and wounds on S.C. (*Id.* ¶¶ 24-26.)

Officer McCarthy did not arrest the Cunninghams at the conclusion of this visit or remove S.C. from the Cunninghams' custody. (*Id.* ¶ 12, 27.) Instead, Officer McCarthy reported what he saw to DCS. (*Id.* ¶ 12.) That same day, DCS opened a case. (*Id.* ¶ 20.) However, DCS "did not perform any investigation thereafter or make any attempt to determine if, in fact, S.C. was in an abusive and neglectful home." (*Id.*)

The FAC alleges that the absence of further action "emboldened" the Cunninghams, who "thereby accelerated their abuse" of S.C. (*Id.* ¶ 29.) The FAC also alleges that "[a]ll Defendants gave [Mr.] Cunningham unreasonable and unwarranted benefit of the doubt and exceptions presumably because he was a Phoenix Police Detective." (*Id.* ¶ 28.)

On February 12, 2017, S.C. died. (*Id.* ¶ 18.) The cause of death was "sepsis from

an open wound on her foot." (*Id*.)  The Cunninghams have now been charged with crimes related to S.C.'s death.  (*Id*. ¶ 43.)

On December 12, 2017, the State Defendants released a public report concerning S.C.'s death.  (*Id*. ¶¶ 33, 35.)

II.   Procedural History

On December 31, 2018, Norwood initiated this action.  (Doc. 1.)

On April 19, 2019, Norwood filed the FAC.  (Doc. 13.)[1]

On April 25, 2019, the parties informed the Court that a sealing order issued by the presiding judge in the ongoing state-court criminal case against the Cunninghams made them "unable to receive or release any of the records needed for the litigation of the matter pending before this court"—specifically, Goodyear police records and DCS records—which, in turn, made them unable to comply with initial mandatory discovery requirements, respond to the complaint, or amend the complaint.  (Doc. 17 at 1-3.)

On April 26, 2019, the Court granted a 60-day stay.  (Doc. 18.)

On June 24, 2019, the parties filed a second joint certification requesting another 60-day stay.  (Doc. 19.)  Later that day, the Court granted the stay.  (Doc. 20.)

On August 20, 2019, the parties jointly requested an additional stay.  (Doc. 21.)

On August 21, 2019, the Court stayed further proceedings until October 30, 2019.  (Doc. 22.)

On October 30, 2019, the parties informed the Court that the records at issue had been unsealed and requested a 120-day extension of existing deadlines due to the "voluminous" nature of the unsealed records.  (Doc. 23 at 2.)  Norwood stated that she

---

[1]   The FAC identifies the plaintiffs as Norwood, in her individual capacity, and "[t]he Estate of S.C., appearing by and through its representative, Sylvia Norwood."  (Doc. 13 ¶¶ 1, 3.)  As a technical matter, the latter plaintiff should be Norwood, in her capacity as the estate's personal representative.  *Ader v. Estate of Felger*, 375 P.3d 97, 104 (Ariz. Ct. App. 2016) ("An estate is a collection of the decedent's assets and liabilities.  As such, it has no capacity to bring or defend a lawsuit.  Simply put, an estate cannot 'act.'  Rather, it can only sue and be sued through its personal representative, who 'acts' on behalf of the estate.").

- 3 -

anticipated filing a second amended complaint based on the information in the unsealed records. (*Id.*)

On November 4, 2019, the Court granted in part and denied in part the parties' joint motion. (Doc. 24.) The Court extended the deadline for Defendants to file a responsive pleading to the FAC to January 28, 2020. (*Id.* at 1.) The Court also informed Norwood that filing a second amended complaint would require Defendants' consent or leave of Court and set a March 12, 2020 deadline for Norwood to file a second amended complaint with consent or a motion seeking leave to do so. (*Id.* at 1-2.)

On January 28, 2020, the City Defendants and State Defendants filed separate motions to dismiss. (Docs. 26, 27.)

On June 15, 2020, following extensions related to the delayed disclosure of unsealed documents, Norwood filed responses to both motions. (Docs. 41, 42.)

On June 22, 2020, the City Defendants filed a reply. (Doc. 43.)

On June 23, 2020, the State Defendants filed a reply. (Doc. 44.)

**DISCUSSION**

I.   Summary Of Claims And Arguments

The FAC asserts three causes of action. Count One is a § 1983 claim against Director McKay and DCS premised on alleged violations of S.C.'s rights under the Due Process Clause of the Fourteenth Amendment. (Doc. 13 ¶ 40.) Count Two is a § 1983 claim against Officer McCarthy and the City premised on *Monell* liability—specifically, that Officer McCarthy violated S.C.'s rights under the Due Process Clause of the Fourteenth Amendment, the City "employed policies, practices and customs, or affirmatively chose to have no policy regarding adequately investigating and/or determining clear and obvious signs of criminal child abuse and neglect," and also "failed to adequately train and supervise its employees . . . regarding said policy(ies)," and these failures were the "moving force" behind Officer McCarthy's constitutional violation. (*Id.* ¶¶ 47-55.) The precise nature of Count Three is unclear. It is labeled "42 U.S.C. § 1983 Wrongful Death . . . A.R.S. 12-611." (*Id.* at 14.) It seeks to hold all Defendants liable for the "aforementioned acts [which] were wrongful and/or negligent." (*Id.* ¶¶ 57-58.)

The City Defendants argue that (1) Count Two must be dismissed because the FAC fails to include any plausible, non-conclusory allegations of a municipal policy, custom, or practice; (2) alternatively, Count Two is foreclosed by *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189 (1989), because Norwood is seeking to impose liability based on their alleged failure to protect S.C. from harm by a private actor;[2] and (3) Count Three, which the City Defendants construe as a "state law" claim, must be dismissed because Norwood failed to comply with Arizona's notice of claim statute. (Doc. 26.) Meanwhile, the State Defendants argue that (1) DCS and Director McKay are not proper parties (because the former is a non-jural entity and the latter is being sued in his official capacity), Norwood is effectively attempting to sue the State of Arizona, and the State is not a proper defendant under § 1983; (2) alternatively, Counts One and Three fail on the merits under *DeShaney*; and (3) Norwood shouldn't be granted leave to assert state-law claims because she failed to comply with Arizona's notice-of-claims statute and because such claims would be time-barred. (Doc. 27.)

II.     Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. The court also may dismiss due to "a lack of a cognizable legal theory."

---

[2]     The City Defendants also contend that, had Officer McCarthy attempted to remove S.C. from the Cunninghams' home during the December 21, 2016 visit, this may have exposed Officer McCarthy to a § 1983 claim for violating Mr. Cunningham's constitutional rights as a custodial parent. (Doc. 26 at 9-11.) Norwood forcefully disagrees. (Doc. 41 at 10.) The Court declines to address this argument because it is unnecessary to the resolution of this action.

*Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

III.  Federal Claims

As an initial matter, the City Defendants are likely correct that the claims against them are subject to dismissal under *Iqbal* due to the absence of plausible, non-conclusory allegations of a custom, policy, or practice and the State Defendants are likely correct that DCS and Director McKay are not proper defendants in this action. These deficiencies, however, theoretically could be remedied by granting Norwood leave to file a second amended complaint. Thus, the Court will address the merits of Defendants' challenge to the constitutional theory underlying all of the federal claims in the FAC—if that theory fails, leave to amend would be futile.

As noted, Counts One and Two are premised on the alleged violation of S.C.'s rights under the Due Process Clause of the Fourteenth Amendment. (Doc. 13 ¶¶ 40-44, 53-54.) It appears Count Three is premised on this theory, too. (*See* Part IV *infra*.) The parties' disagreement turns on whether this theory is foreclosed by *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189 (1989).

In *DeShaney,* a four-year-old boy was beaten so severely by his father that he fell into a life-threatening coma. 489 U.S. at 193. County social workers had been aware of suspicious injuries and possible child abuse for over two years but failed to intervene. *Id*. at 192-93. The boy and his mother brought a § 1983 suit, alleging a denial of the Fourteenth Amendment's guarantee of due process, but the Supreme Court held that "failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id*. at 197. The Court explained that "[w]hile the State may have been aware of the dangers that [the victim] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id*. Put another way, "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id*. at 196.

Although *DeShaney* stands for the general proposition that a state actor has no constitutional obligation to protect individuals from private harm, the Ninth Circuit has

recognized two exceptions to this principle. "First, a special relationship between the plaintiff and the state may give rise to a constitutional duty to protect." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019). "Second, the state may be constitutionally required to protect a plaintiff that it affirmatively places in danger by acting with 'deliberate indifference' to a 'known or obvious danger.'" *Id.* (internal quotation and ellipses omitted).

### A. "**Special Relationship**" Exception

The "special relationship" exception applies when a state "takes a person into its custody and holds him there against his will." *Patel v. Kent School Dist.*, 648 F.3d 965, 972 (9th Cir. 2011). "In such a situation, the state has a duty to assume some responsibility for [the person's] safety and general well-being because it has render[ed] him unable to care for himself." *Campbell v. Washington Dep't of Soc. & Health Servs.*, 671 F.3d 837, 843 (9th Cir. 2011) (internal quotations omitted). "The types of custody triggering the exception are incarceration, institutionalization, or other similar restraint of personal liberty." *Patel*, 648 F.3d at 972. "The special-relationship exception does not apply when a state fails to protect a person who is not in custody." *Id.*

The City Defendants argue the "special relationship" exception is inapplicable here because "it is not alleged that S.C. was in custody of the City of Goodyear, either when Officer McCarthy conducted his welfare check, or when S.C. succumbed to illness or injury two months later." (Doc. 26 at 6-7.) The State Defendants likewise argue that "[b]ecause the State Defendants did not have custody of S.C., there was no special relationship." (Doc. 27 at 5.) In response, Norwood argues that, under *Horton v. Flenory*, 889 F.2d 454 (3d Cir. 1989), Defendants' decision to allow S.C. to remain in the Cunninghams' home following the December 21, 2016 visit effectively amounted to placing S.C. in state custody. (Doc. 41 at 6-8; Doc. 42 at 6-9.)

In *Horton*, a private club owner, who had recently retired from the city's police force, suspected that one of his employees was stealing from him. *Id.* at 455-56. After the club owner identified, detained, and began interrogating the suspected thief, he called the police department for assistance. *Id.* at 456. Notably, the police department followed an "official policy" of "maintain[ing] a hands off policy with respect to events transpiring in

private clubs." *Id*. Accordingly, when a police officer arrived, he "instructed [the employee] to remain at the club," even though the employee "was crying and asked him to take him out." *Id.* Later, after the officer left the club, the owner beat the employee to death. *Id.* at 456-57. In the ensuing § 1983 action, the Third Circuit held that the employee's claims against the city fell within the "special relationship" exception to *DeShaney* because "[u]nlike the passive role of the neglectful social workers in *DeShaney*, the role of the state actor here . . [was] anything but passive. . . . [H]e used his official status to confirm that [the club owner] was free to continue his custodial interrogation even though [the employee] was in fear for his safety and wanted to leave. Clearly, [the police officer] was a participant in the custody which led to the victim's death." *Id.* at 458.

Norwood's reliance on *Horton* is misplaced. As an initial matter, *Horton* is a Third Circuit case that, according to Westlaw, has never been cited by the Ninth Circuit or by a district court within the Ninth Circuit. This Court must follow Ninth Circuit law and Norwood has not cited any Ninth Circuit cases applying the "special relationship" exception under remotely analogous facts. In any event, *Horton* is easily distinguishable. Norwood emphasizes that, "[l]ike the retired officer in *Horton*, Cunningham was a police detective." (Doc. 41 at 7.) This is true but irrelevant. Although the club owner in *Horton* happened to be a former police officer, the Third Circuit didn't find that the victim was effectively in state custody due to the club owner's law enforcement background—rather, the court's analysis turned on the fact that an actual police officer was physically present when the abuse was occurring, the officer's refusal to intercede was based on an official policy, and the officer helped contribute to the abuse, in a manner that was "anything but passive," by affirmatively instructing the victim to stay put as he was crying out for help. Here, in contrast, Defendants are accused of the same sort of passive neglect that was present, and deemed non-actionable, in *DeShaney*.

Taken to its logical conclusion, Norwood's position is that whenever a state agency becomes aware that a law enforcement officer may be committing child abuse in his private life, the agency has an affirmative constitutional obligation, enforceable via § 1983, to protect the officer's would-be victims from future harm. This would be a fairly dramatic

expansion of the "special relationship" exception to *DeShaney* and Norwood has not identified any judicial decision ever recognizing it.

The bottom line is that, at the time of her death, S.C. was not "incarcerat[ed], institutionaliz[ed], or [subject to some] other similar restraint of personal liberty." *Patel*, 648 F.3d at 972. It follows that Norwood cannot rely on the "special relationship" exception in this case.

B. "**State-Created Danger**" **Exception**

"[I]f affirmative conduct on the part of a state actor places a plaintiff in danger, and the officer acts in deliberate indifference to that plaintiff's safety, a claim arises under § 1983." *Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997). "In examining whether an officer affirmatively places an individual in danger . . . we examine whether the officers left the person in a situation that was more dangerous than the one in which they found him." *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000). "[T]he 'critical distinction' for finding liability is not 'between danger creation and enhancement, but . . . between state action and inaction in placing an individual at risk.'" *Hernandez v. City of San Jose*, 897 F.3d 1125, 1135 (9th Cir. 2018).

The City Defendants argue the "state-created danger" exception is inapplicable here because "it is not alleged that S.C.'s living conditions were created by the City of Goodyear. Nor is it alleged the City of Goodyear took action that rendered S.C. any more vulnerable to harm than she was before Officer McCarthy made his observations. Indeed, . . . S.C. should have been in a better position based on McCarthy's immediate reports to DCS." (Doc. 26 at 7-8.) The State Defendants similarly argue "[t]here are no allegations in the FAC that sufficiently allege that State Defendants created the danger of the alleged abuse to the decedent by her parents. Although[] the allegations in the FAC suggest that DCS was aware of the abuse, this is not sufficient . . . ." (Doc. 44 at 6-7.) In response, Norwood argues the exception is applicable because Defendants' decision to give Mr. Cunningham an "unreasonable and unwarranted benefit of the doubt" had the effect of "embolden[ing]" the Cunninghams to "accelerate[] their abuse," thereby placing S.C. in a worse position. (Doc. 41 at 8-9; Doc. 42 at 9-10.)

Norwood's "emboldenment" argument lacks merit. Although Norwood creatively seeks to frame Defendants' involvement in these events as affirmative conduct, the essential nature of Norwood's claim is that Defendants "abandoned their duty to conduct any type of investigation upon the third-party abuser." (Doc. 42 at 10.) This is properly considered inaction, rather than action. Defendants left S.C. in no worse a situation—and tragically, no better a situation—than the one in which they found her. Because the FAC fails to plausibly allege that Defendants played a role in the *creation* of the danger that led to S.C.'s death, Norwood cannot invoke the "state-created danger" exception.

As a final point, the analogy between this case and *DeShaney* is compelling. The defendants in that case were "social workers and other local officials who received complaints that petitioner was being abused by his father and had reason to believe that this was the case, but nonetheless did not act to remove petitioner from his father's custody." *DeShaney*, 489 U.S. at 191. The plaintiffs' theory in *DeShaney* was that the defendants' "failure to act deprived him of his liberty in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution," a theory the Supreme Court rejected. *Id*. The Court noted that "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation" and that "[t]he most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." *Id*. at 202-03. The same legal theory, based on similar facts, can't succeed here.

C.     **Conclusion**

For the reasons stated above, Norwood's Fourteenth Amendment-based § 1983 claims must be dismissed. This means that Norwood's *Monell* claim against the City also fails, because "an individual may recover under § 1983" against a public entity "only when his federal rights have been violated." *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir. 1996). *See also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally

excessive force is quite beside the point.").

IV.  Equitable Tolling

The City Defendants characterize Count Three as a "state law wrongful death claim" and argue it must be dismissed because Norwood failed to file a notice of claim. (Doc. 26 at 11-12.)  The State Defendants, meanwhile, construe the FAC as asserting only federal claims but argue that, after all of the federal claims are dismissed, the Court should not "allow[] Plaintiffs an opportunity to amend the FAC to allege state tort claims" because such claims would be futile in light of Norwood's failure to file a notice of claim.  (Doc. 27 at 6-7.)  In response, Norwood agrees with the State Defendants that the FAC doesn't contain any state-law claims, and concedes that she didn't file a notice of claim within the required timeframe, but argues she "should be allowed to amend [her] complaint to allege state tort claims, despite a failure to serve a notice of claim," because she is entitled to equitable tolling.  (Doc. 41 at 11-12; Doc. 42 at 11-12.)  In reply, Defendants argue that Norwood was aware of sufficient facts to file a notice of claim within the statutory timeframe so equitable tolling is unavailable.  (Doc. 43 at 11; Doc. 44 at 7-8.)

Because Norwood has clarified that Count Three is a federal claim and that she is seeking leave to amend for the sole purpose of attempting to add new state-law claims, it would be inappropriate for this Court to resolve the parties' arguments concerning the potential availability of equitable tolling.  All of the federal claims in the FAC—and it only contains federal claims, as Norwood has now clarified—are foreclosed by *DeShaney*.  This means the FAC must be dismissed in its entirety.  Additionally, the Court declines to grant leave to amend as to the federal claims because it has not been sought by Norwood[3] and because any such amendment would be futile.  *See, e.g., AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) ("Rule 15(a) is very liberal and leave to amend 'shall be freely given when justice so requires.'  But a district court need not grant leave to amend where the amendment . . . is futile.") (citation omitted).

---

[3]   As noted, Norwood doesn't request leave to amend as to her federal claims in the event of a dismissal—she only requests leave to amend so she can attempt to add new state-law claims.  (Doc. 41 at 10; Doc. 42 at 10.)

- 11 -

Given this backdrop, any opinion concerning the availability of equitable tolling would be advisory in nature. Indeed, irrespective of whether Norwood might be entitled to equitable tolling as to the theoretical new state-law claims she might assert in a future iteration of her complaint, this Court would decline to exercise supplemental jurisdiction over those claims now that all of Norwood's federal claims have been dismissed without leave to amend. *See, e.g.,* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a [pendent state-law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction."); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1255-56 (6th Cir. 1996) ("After a 12(b)(6) dismissal, there is a strong presumption in favor of dismissing supplemental claims."). Moreover, considerations of federalism and comity would be best served by allowing the Arizona state courts to address the issue of equitable tolling should Norwood attempt to initiate a new action in state court raising new state-law claims. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.").

Accordingly, **IT IS ORDERED** that the City Defendants' motion to dismiss (Doc. 26) and the State Defendants' motion to dismiss (Doc. 27) are **granted**.

**IT IS FURTHER ORDERED** directing the Clerk of Court to terminate this action.

Dated this 15th day of July, 2020.

Dominic W. Lanza
United States District Judge